I'm just going to be using the bleacher right here and not turn it on, maybe. Okay, our next case this morning is No. 172155, Continental Service Group v. United States. Before you begin, Mr. Major, two things. One, we only want to hear rebuttal from one counsel, so I guess that means Mr. Sneckenburg needs to use his other minute in his opening argument. And then, second, we'd like counsel in these Continental cases, both of them, to remain in the courtroom after the oral argument. The court will recess and then we will resume after some period of time. Okay, so why don't we begin, Mr. Major? All right, thank you, Your Honor. May it please the Court. The United States Court of Federal Claims issued an overly broad preliminary injunction disrupting the pre-litigation status quo. The Court did so without properly weighing the agency's decision to take corrective action, which mooted the challenges before it. Well, there are two aspects of this, and let's put aside for the moment the second aspect of it, which is called the dilution aspect of the preliminary injunction. Insofar as the preliminary injunction is directed to the original award, the 2016 award, and the government is undertaking corrective action as to that, correct? That is correct, Your Honor. And so why doesn't the Court of Federal Claims have the authority to continue the injunction until the corrective action is completed? What's the authority that it lacks that authority? Well, Your Honor, that would be this Court's precedent in Chapman Law Firm. Ultimately, the agency's decision to take corrective action ended up mooting the protest. And Chapman's very much on point here because… Moot the protest because, as I understand it from the briefs, there may be disputes about whether the corrective action is sufficient or not, right? Well, actually, Continental never challenged the sufficiency of the corrective action. It simply challenged the fact that its injunction was going away, which makes it… Why would it challenge the sufficiency of the corrective action before it knows what the corrective action is? Well, that would be the result of the corrective action, not the sufficiency of the corrective action. The agency spelled out what it was doing in terms of the corrective action in two declarations before the Court. So it knows exactly what the agency was doing. It submitted a proposal in response to the agency's corrective action. It doesn't know the evaluation yet, but there is no evaluation at this time. So the agency can't… There's no evaluation in existence because that evaluation was set aside as part of the corrective action. Now, Continental could subsequently file a challenge as a result of the corrective action if it's unsatisfied as a result of the corrective action, as could any other party that ultimately… Starting a new lawsuit? Yes, and it could also start… It could have started a lawsuit where actually in this suit challenged the sufficiency of the corrective action, said you didn't look at small business… What case says they have to start a new lawsuit? What's that? What case says they have to start a new lawsuit? Well, I said they could, Your Honour. They could start a new lawsuit… Is there any case that says they have to do it in a new lawsuit? I'm not aware of a case that says they have to do a new lawsuit. In this case, ACSI did so, which was another party that was not happy with the sufficiency of the corrective action. They did institute a separate lawsuit. And that was dismissed? Yes, and that was dismissed. The corrective action was found by the court to be reasonable under the circumstances. And also with regards to Continental, Continental at the time could have objected and said, and could have said simply, and I don't think it could have, well, I don't think it could have based on the facts, but had Continental felt the corrective action was insufficient, could have said, you know, we have these claims in our complaint. These claims are not addressed. The only claim the corrective action doesn't address is Count 7, which the court had already dismissed and which Continental… What is the schedule for the corrective action now? Your Honor, the agency is undertaking corrective action. We don't know when it's going to be completed. You have no idea? No. Your Honor, the last time the government made an estimate or the Department of Education made an estimate, it was seriously incorrect and overly optimistic. We have to acknowledge that. It had hoped to complete the corrective action sometime in August. That has proven absolutely untrue after it started going through the proposals and attempting to evaluate them. But the agency has multiple tasks. It has to evaluate the, I believe it's 36 or so or 38 offers that it's received. It needs to compare them. It needs to consider, you know, which offers the best value. It needs to determine how many awards it's going to make and that involves a lot of back and forth between various components within the agency. And so as a result, it's taken longer than the agency had hoped. The last time the agency had done these steps, it had taken a year. I think it's safe to say it will take less than a year because there is some replication and duplication of effort. But the last time this had taken a year. This was started in May?  If the second part of this injunction on the dilution theory is so harmful to the government, why is it that you didn't renew the request for a stay here when the Court of Federal Claims didn't act on your stay motion in that court for months? Well, Your Honor, we already had the request pending. This court had held that that was going to be held in abeyance. I think we held the same perspective initially that the Court of Federal Claims would act promptly on it and that request for a stay would ultimately be resolved. It was not. That's correct. But we believe ultimately that this court is aware of what is going on and determined that we simply shouldn't be spending our time as much as we could going to the court and making a request for relief that we've already made and constantly asking this court for the same. Well, in case you don't know, there are two separate panels that deal with these matters. One is the motions panel. They enter their order, and then the case goes to a merits panel, which isn't assigned until six weeks before the argument, just for future reference. And yes, Your Honor, and that's why also consistent with this court's order, as soon after we knew it was assigned to the merits panel, we got a further order asking to inquire of the court whether it was going to resolve the motion to stay. It did so on October 31st, and then sooner after this court ordered us to- Maybe you should have asked earlier for the Court of Federal Claims as to why it hadn't acted on the motion, right? Perhaps. Perhaps, Your Honor. But at the end of the day, we do assume that the judge at the Court of Federal Claims was aware of the motion and would act on it promptly. We were incorrect, but nevertheless, we had hoped- Given how motions had proceeded previously in the past in this case, they were very quickly resolved. Did the court respond to that? I don't recall whether they did or not. Did they respond to your letter? Well, we sent in- we filed it by way of a motion, and the court responded by denying the motion to stay on October 31st. And we informed the court of that soon thereafter. Why don't you address the dilution part of the injunction? Well, Your Honor, I mean, first, with regards to dilution, there are no actual findings of dilution from the trial court. So, I mean, to the extent they're claiming dilution, that just simply- there are no findings supporting it in terms of harm. But more to the point, at the end of the day, what this does is it stays contracts that are not at issue and being directly protested at the Court of Federal Claims. Continental hasn't challenged the small business awards. It- well, it had challenged the award term extensions in a separate suit, which the Court of Federal Claims recently ruled on. But at the end of the day, what the court has done is stayed not matters in connection with the protested procurement or the protested award, again, which the government agreed to voluntarily stay, thus setting aside any claim of irreparable harm. Instead, what the court did was it stayed a much broader set of contracts, preventing the agency from fulfilling its programmatic responsibilities, preventing the agency from complying with Congress's directive to help borrowers with student loans default. Simply extrapolating from what was before the trial court, we're approaching having a million borrowers whose loans are in default who cannot obtain reconciliation services from the Department of Education, who are in a position where, quite simply, the Department of Education can't provide them the help that it would like to and that it would need to as a result of the court's injunctions. We're not aware of any case in which the Court of Federal Claims has issued so broad an injunction. And while Continental Services does... Well, you can imagine situations in which the Court of Federal Claims might appropriately issue such an injunction, right? If in this case there were evidence that the government said, well, there were internal emails, let's say we can avoid the effect of this challenge to the 2016 award by simply shifting the business to the earlier contracts and therefore we can move the challenge to the 2016 awards. If there were something like that... Your Honor... Wait. Sorry. If there were something like that, maybe the Court of Federal Claims could issue an injunction to preserve the status quo, right? I wouldn't say necessarily in that situation. The agency does have great discretion in deciding how to basically issue its work. This is about a challenge to a procurement and a specific award. But I could imagine a context. Say perhaps we had a requirements contract. This is what's known as indefinite delivery, definite quantity contract, in which case there's no particular set of accounts that are assigned to that particular contract should someone get an award. But a requirements contract is a little bit different. In a requirements contract, you're supposed to give all of the work to one particular contractor. And in that type of scenario, I might be able to envision a situation in which a broader injunction might be appropriate. But it would need to be directly tied into the procurement itself. Can I ask you a question? This is at page 101670. It's, I think, your Dr. Bradfield's declaration from, I guess it's May 19th, where you kind of tell the court that there's corrective action that's being undertaken. Go ahead, John. I'm familiar with it. I get that reaction a lot. You say, in the event that any of the current awardees, like Continental, I guess, are not evaluated, okay, not like Continental, but the awardees, are not evaluated as having a proposal among the most advantageous to the government, the Education Department, will terminate those awards for the convenience of the government. Does that mean that, in some sense, the December 2016 awards are still active? No, they're staying. Because they haven't been terminated yet? They don't terminate them. Usually what happens is the government doesn't terminate an award if it's taking corrective action until such time as it's completed the corrective action. What it will do is stay the award, saying you can't proceed on the contract, you can't do any work on that particular contract. If the Department of Education decides this corrective action business is just too much for us or something, and it just stops doing it, then the December 2016 awards that are the subject of the current protest spring back to life. In any event, this case can't be said to be moot simply because the department has initiated and even taken several steps down the path of corrective action? Well, the agency has committed itself to corrective action. It's put a stop work order in place. The contracts do, yes, they do continue to exist in this case. But again, because we're taking corrective action, we can't proceed with those contracts. So the court of federal claims is obligated to believe the government? Yes, and that's what Chapman Law Firm stands for. There's a presumption of good faith unless, again, unless there is something else that otherwise would incline the court to believe so. So if there was evidence of bad faith, that would be a different situation. We know that from the Garufi case. But it's not a question of bad faith with respect to the first part of the injunction. It's a question of whether it's moot. And just because the government says it's going to do something until it actually does it, why is the case moot? Well, the government didn't file its motion to dismiss until the government had initiated its corrective action. So we've actually started to do our corrective action. And there's no reason, as the court made clear in Chapman, to believe that we otherwise will not do it. If someone had objected to the substance, then we'd be having a dispute, an ongoing dispute about the scope of our corrective action, about what we are going to do. And in that case, yes, the case would not yet be moot. But again, here, in response to our motion to dismiss, Continental and Pioneer did not object to the substance of the corrective action. Can I ask you one question before you? This is a change of topic. So let me see if I can get my hypothetical right. You have a government awarding a contract. It protests, goes to the Court of Federal Claims. Government isn't taking any corrective action. It doesn't think it's done anything wrong. There's no stay of anything. The new contract starts to be performed. After a year, the Court of Federal Claims, let's say it's affirmed by us, says protest is a sound protest. Contract award has to be set aside. Does the protester, in that case or elsewhere, have available means for securing relief from the period during which the erroneous contract was in place? No, because the only damages that, well, in a normal case, no would be the case because the damages that are available to them are limited to preparation costs under the bid protest statute. So while they could get the costs of having prepared their bid, they could not get the costs, sort of effectively lost profits. Now, there may be different variations on that where someone has an existing contract and then could file a CDA claim and otherwise would have a remedy under the CDA, but that's a sort of different nuance on it. Okay. Thank you. I see my time is up. We'll save two minutes of your rebuttal time and hear from Mr. Sneckenburg. Thank you, Your Honor. Your Honors, may it please the Court, I'd like to briefly address… You and Mr. Schaffer are not seeking a stay of the first part of the injunction, right? Your Honors, we agree with the government that the first part should be stayed, but it's really irrelevant to us. Our focus is the second part. That is the only part that impacts us. Okay. And, Your Honors, I would like to, for that reason, I would like to address the second part of the injunction. And specifically, the ATE contracts, the award term extension contracts. At the beginning of Mr. Mager's discussion, there was some talk about the different lawsuits that could be filed. Obviously, it's a basic principle that an injunction is an extraordinary remedy that must be tied to the specific claims at issue. Here, there are no actual claims in the lawsuits in this case. And, in fact, there are no claims anywhere at this time challenging the ATE contracts. As such, there is no valid basis to enjoin those contracts. Now, while Mr. Mager addressed this, I think it bears repetition. Concert filed the seven-count complaint. The court dismissed count seven, the quote-unquote dilution count. Counts one through six, they only challenge the large business procurement and the large business awards from December 2016. They do not challenge the ATE contracts. Well, I don't see that that is an answer to the question of whether an injunction is appropriate to prevent dilution. I mean, district courts and the Court of Federal Claims has some authority to preserve the subject matter of the case if it feels that action is being taken to undermine the possibility of future relief, no? Your Honor, if there was actually a showing that there would be such dilution and if the Court of Federal Claims made findings that there would be such dilution,  However, here we have neither of those. Here, the dilution theory, in fact, it was never espoused by CONSERV before this litigation. It wasn't even espoused in their initial complaint. When they filed their complaint, CONSERV had an ATE contract. If you carefully read count seven of their complaint, it actually requests that the court order education to give CONSERV work under its ATE contract. It was only subsequently that once its ATE contract expired, that it came up with this new idea that there would be dilution of large business contracts and now we need to freeze everything. CONSERV, when it had an ATE contract, never once argued that its own contract would dilute potential future work for the large business contracts. Nor did CONSERV, for years before this litigation, ever challenge these small business awards, arguing that those would supposedly somehow dilute the work that would subsequently be awarded under the large business contracts. As Mr. Mager said, this is not a situation where it's a requirements contract. It's not. These are IDIQ contracts. The Department of Education has multiple separate and distinct contract vehicles that it can distribute similar work to. Okay, I think we're out of time, actually. We're over time. Okay, thank you, Mr. Steckenberg. Mr. Schaefer? Your Honor, may it please the Court, to answer Judge Dyke's question, Pioneer does oppose a stay of the first part of the preliminary injunction. We're only here to talk about part two of the injunction, which is overbroad because it stays contracts that were not part of the bid protest. And what's important is the judge blowing trial court, it was a four-factor test, and she did not consider the irreparable harm to our client, Pioneer. Pioneer's AT contract, it's a bridge contract, so it's limited in scope and time. And every day that goes by is a day that Pioneer can never recover. So Pioneer and Altran are the only parties here that suffer irreparable harm by part two of the PI, and that's a factor that was never considered by the trial court. Now, we agree with Altran and DOJ that the entire part two of the PI is overbroad, it's unsupported, there was no evidence of dilution. There is no dilution because these accounts keep coming in. So for the new awardees, they're going to get their five years of service. So if Conserve wins a new contract, it will get five years of accounts. But every day that goes by is a day that Pioneer loses accounts that it will never, ever recover. And I think it's a critical element of the injunctive relief test that was not considered by the court below. Okay. Thank you, Mr. Shaffer. Thank you, Your Honor. Mr. Connie. Your Honors, may it please the Court, Todd Connie with Pillsbury Winthrop for Conserve. As a government contracts attorney – I mean, this record is pretty thin in terms of dilution or diversion, right? What did you put in that would support the notion that the government was diverting work from the prospective awardees that would result from the corrective action to the small businesses and ATE contract holders? What evidence is there that it was going to divert work? So what we presented to the court, Your Honor, is that prior to the improper conduct here that is alleged in December, the large contract holders were receiving two-thirds of all transfers. Small businesses were receiving one-third. And that was presented on a spreadsheet attached to our complaint. I see. What we also explained to the court is that immediately upon the illegal awards being enjoined, the government started sending 100 percent of all transfers to the other contract, effectively backdooring all the work. We call it dilution or siphoning. What we asked the court to do was to enjoin that conduct and to preserve this procurement for the ultimate awardees. The status quo being preserved effectively is two parallel procurements going forward, which allowing Ed to award transfers as it sees fit. No, that's not the status quo. The status quo is to allow the government to continue to make awards under these other contracts. Well, Your Honor, obviously we respectfully disagree with that view. If Ed were allowed to continue transferring accounts during the period of this protest, as you can see, one year has passed. What's the evidence that the government was doing something different with respect to, let's say, the small business contracts than it was doing before? Your Honors, if we would look at the complaint and we would look at the exhibit attached to the complaint, Attachment 1, there's a spreadsheet. Can you give a page, please, in this? Yes, Your Honor. Multi-volume joint appendix. It looks like it is Appendix 1000-10007. What you will see here is a chart full of data. If we look at the historical transfer history, you'll see that the large contractors, five of them, one of which was Conserve, which is the predecessor contract to the contract that's being protested, were receiving approximately two-thirds of all transfers by month. What you'll see is immediately after the conduct, those contractors received zero, and all of the work was shifted over to the small businesses. What we allege and what we believe to be the case is all of the work that would be going to those five large contractors is ultimately work destined for this procurement. What's the evidence that was shifted over? I'm looking at the bottom of this page where it says total small, and it gives numbers. I guess these are numbers of accounts, right? Correct. How does this show that they shifted work over to the small business contractors? These people have had work all along. Your Honors, if you would look at the account activity for January, February, and March of 2017. Of 2017. Two right-hand columns. Exactly. Three right-hand columns. You will see, look up at the line that says total to the largest. Start there, and you'll see that the largest were receiving approximately 200,000 account transfers roughly, give or take, some months 400,000, some months 170,000. But you'll see the activity up and through the legal awards. You'll see it then dips down to zero. For what? Let's take the small businesses first because that's what you were talking about. Total small. There doesn't seem to be a pattern of increasing the awards to the accounts given to the small businesses, right? Your Honor, what we would submit to this court is that the Department of Education was not withholding transfers. As you've heard counsel for the government say, these are borrowers that they want to assist. They're not withholding transfers. They're sending all their transfers that are available at that point in time. So you're correct that the numbers fluctuate, and the point is that the large businesses, this contract that we're preserving. No, but my point was not that the numbers fluctuate, that they're somewhat consistent in the sense that they're giving 100,000, 150,000 or so accounts to the small businesses. I don't see any change over time here that would suggest some sort of manipulation. Your Honor, the consistency is in the proportion of distributions. If you evaluate the historical data, which we have, the large businesses up until this illegal award were receiving approximately 66% of all transfers. But focus on the small businesses. What's different about the small businesses? They're receiving 100% of all transfers, Your Honor. Let me see if I understand. So if you look at the last five columns and start with November 16 and December 16, and you look at total large. Am I allowed to read these numbers? Yes, Your Honor. So you have – well, look at November. So you have 200 – I can't see this, it's too small – 205,000 or something to the large and 140 to the small. And then the next month you have 56 to the large and 139 to the small. And then the next month, January, zero to the large and 100 – what is that? You're exactly right, Your Honor. And that's the shift that you're – That's the shift. And the reason in December we received some transfers is because the awards came out on December 9th or 11th, and the Department of Ed makes their transfers that week. So we believe they downshifted. We actually alleged at one point that we believe we were being punished for pursuing our protest rights. But you do see that shift goes from a large number each month, which we believe represents about 66% of all transfers to zero. And the key point we made, and Chief Judge Braden agreed, is that this was diluting this procurement, and we're here to preserve this procurement. No one is harmed here because these transfers are all available. Wait a moment. Nobody got any accounts under the 2016 contracts, right? The awardees were enjoined under the SECA, Your Honor. Yeah. So there were never any accounts given under the 2016 contract. The five large businesses that we're talking about, Your Honor, are surrogates for this contract. That's effectively an award term extension bridge contract to your contract for this contract. But you challenged those contracts, the term extension contracts, and that just got dismissed, right? Your Honor, would you repeat that question? Your challenge to the extension, the bridge contracts, got dismissed, right? Account seven was dismissed of our complaint, Your Honor. No, no, no, just now, just a couple of days ago. We received a notification. Oh, Your Honor, are you referring to our protests of the award term extension contracts? Yes. Pioneer and alternate. Yeah. Let me address that. So, Your Honor, those awards were made two years after they protested their contracts in the midst of our litigation. But the diversion here involves those two, if I understand correctly, and please correct me if I'm wrong. Sure. The alleged diversion concerns diversion to those two contracts and to the small business contracts, correct? No, there's been no diversion to the award term extension contracts. They were only awarded contracts three months, four months ago, in the midst of our litigation. Please say diversion to. Diversion was to the 11 small businesses. Okay. Now, the Department of Education desired, this is a very important point, and I want to make it very quickly. The award term extension contracts that were just awarded were awarded over two years after their original protests. They have no relief now because they didn't obtain an injunction-like concert. Okay, but I don't understand. The small business contracts were entered into, I don't know. 2014. 2014. There's been no challenge to those contracts. Why are not the small businesses entitled to receive accounts pursuant to those contracts? What's the matter with that? Your Honor, I fully understand and appreciate the concern you're expressing. And so during our May 22nd hearing, we had actually suggested to the government, and we noted this in our complaint, that the status quo before the illegal conduct was a situation where there were parallel procurements with two-thirds going to the largest, one-third going to the smalls. And what we argued in favor of, in fact, was a cap to be placed on the total number of transfers going to the smalls. The smalls were in favor of it. The Department of Justice was against it. And, in fact, the court asked the parties to go back and come up with a proper- Okay, but there's no cap in this injunction. It just says you can't do it. Because the Department of Justice was unwilling to provide data to the court, and it's in the May 22nd hearing on the record in the appendix. They refused to cooperate with the court's efforts to fashion appropriate relief here. So with its hands tied behind its back, the court did what we believe was reasonable. And we don't believe it's an abuse of discretion for the court to say, I'm going to pause these contracts. As soon as these awards were made, and if they were made promptly, you would have a situation where the Department of Education could begin- So what you're saying is because the government didn't agree to the cap, it was appropriate for the Court of Federal Claims not to impose a cap? The Court of Federal Claims does not have access to the data, first of all, to start micromanaging or administering that contract. This is the key- But it's your job to provide the data. And if you can't provide it from your own resources, you can ask for discovery to get it. But the problem is here we have small businesses who are entitled to awards, and all of a sudden- They're not entitled. Wait, please do not interrupt. And all of a sudden, under the injunction, they're not entitled to receive accounts. And what you're complaining about is the potential, I guess, that the small businesses would get more business than they would have otherwise as a result of the corrective action or actions by the government, and that you wanted to make sure that they didn't transfer the accounts to the small businesses. That would seem, perhaps, to justify an injunction saying, well, if small businesses have to get the same amount they were getting before, they can't get anything additional. But that's not what the injunction says. Your Honor, may I address the Court and respond to this particular issue? So the small businesses are not entitled to any account transfers. It's not a question of entitlement. It's a question of whether you have any basis for denying them the kind of level of account servicing that they had before. So that was point one. There's no legal entitlement. I just want to make that point. Second of all, the small businesses received over 300,000 account transfers during the January, February, March time frame of 2017. They were continuing to service those accounts. There's also been millions of transfers before that date. They were continuing to service those accounts. The problem for the Court of Federal Claims, as you can imagine, the number of divergent interests arguing here, would have been for the Court to get involved into the administration of that contract and to set a cap and to manage that. As you can tell, the Department of Education would not give any data to the Court of Federal Claims. And so the Court of Federal Claims effectively would have had to determine which— Did you ask for discovery on this issue? Your Honor, we attempted to engage in that type of an effort with the Department of Education. Did you ask for discovery on this issue? I believe we did, Your Honor. I believe we did. You believe we did? I think it was about March time frame, Your Honor. March or April time frame. Probably April time frame, Your Honor. And what we did—I have the emails. We exchanged correspondence. Did you file a motion to compel discovery? No motion, Your Honor. No, we did request the record in the case. But the final point I want to make on this particular issue is that for the Court of Federal Claims to get involved in the business of caps and setting caps would require the Court of Federal Claims on a monthly basis to trust the Department of Education's pool number. So the Department of Education would have to give the Court a pool. We have 200,000 transfers available, and now we want you to cap those at 60 or 70,000 to reflect a third. The Court could not get into the business of administration. And even if this Court believes a cap could have been employed, the fact that the Court did not employ a cap does not render its decision an abuse of discretion. The Court was doing its very best under the circumstances to fashion appropriate relief. It balanced the party's interests here, it considered the divergent interests, and it ultimately determined that the best approach to preserve this procurement was a pause. And it was envisioned to be a temporary pause. The government told the Court since May 2nd that it would be taking corrective action. Your Honors, I want to make three final points here, and that is the issues that are involved in— You're actually out of time, so we'll give you 30 seconds here. 30 seconds. Thank you, Your Honor. The issues involved in this case are so significant for government contractors. The way that you come out on these issues could determine how agencies structure procurements in the future, and moreover, how protests are litigated. If the agencies are allowed to set up and structure parallel procurements, a protest will never have the type of effect it was intended to. Irreparable harm will never be able to be addressed, and the agencies can always off-ramp work to another contract. This takes away the Court's ability to really stop illegal procurement actions, as you all indicated at the beginning of your questioning. Okay. Thank you, Mr. Connery. Mr. Coulter, you have a minute. Thank you, Your Honor. May it please the Court, Tom Coulter representing Progressive Financial Services, Inc. My client, Progressive, has a slightly different interest before the Court, and as you heard the government say, a party can in fact challenge the sufficiency of corrective action, and if they so challenge corrective action, their protest is not moot. That is precisely the position that Progressive is in. That is precisely what Progressive challenged. Progressive has in repayment accounts under its former incumbent contract that had the process been completed timely and correctly, it would have been in a position to retain those accounts. So that was the status quo at the time of the illegal improper procurement action that the GAO overturned. At that point, all we asked was the right to retain those accounts until a new award decision could be made, such that we would be in the position we would have been in had a proper procurement process taken place. Education would not allow that to happen. They insisted on trying to recall those retained accounts, and so we pushed forward with an injunction. I think the trial court properly saw that without an injunction, we would suffer immediate irreparable harm. All those accounts would be recalled, and that's the very basis of our protest, was to keep those accounts. Thank you, Mr. Colvin. Thank you, Your Honor. Mr. Major, you have two minutes. Your Honor, just a few brief points, first taking off of that. The corrective action decision post-states the recall decision. No matter what Progressive accounts, we're going to be subject to recall on April 21, 2017. Ultimately, the recall notices went out before the agency decided to take corrective action, so it can't be part of the corrective action. With regards to dilution, Continental still insists on treating this as a limited pie of work. Ultimately, it's more like a river, as the court itself ultimately did recognize. You have a contract for a period of time. You can receive accounts on that contract during that period of time while you have that. You're not given a certain percentage of work. You're not guaranteed a percentage of work. As for the numbers and explaining the history of those, in December was when the GAO protest was filed, so we weren't assigning new work to other contracts. The smalls had been in a ramp-up period. Those who had existing award-term extensions, such as Continental, were in a ramp-down period because their contracts were expiring in April of 2017. Ultimately, because these small businesses in a ramp-up had demonstrated that they could sufficiently handle the work, they were handling the majority of the work as of December of 2016. In that chart, the number in the pool remains steady indeed, slightly increases between December 16 and January and February 17. The dollar amounts drop some, but the number, and yet the smalls get everything in those two months. Yes, because at the time, the remaining ATEs were in ramp-down period, and we had existing contracts of smalls who had been spending the last several years ramping up and demonstrating that they could handle the capacity. At the end of the day, the amount of accounts that you receive will depend upon the number of defaulted accounts that come into existence in the future, which will depend upon things like the economy and a number of other factors. The policy of the Education Department is to favor small businesses, correct? Yes, it is. And is there any question about the legality of that? No, there is not, Your Honor. Okay, we're out of time. Thank you. Thank you, Your Honor. Thank all counsel. The case is submitted, and as I mentioned earlier, counsel should remain in the courtroom.